BROWN *v.* DARK.

4-5147

Opinion delivered July 4, 1938.

*Sidney Kelley* and *Lamb & Barrett,* for appellants.
*Gus Causbie* and *John C. Ashley,* for appellee.

GRIFFIN SMITH, C. J. Appellee Dark's six-year-old son, while playing with other children on a rock fence March 4, 1937, suffered green stick fractures of both the ulna and radius bones of the left arm. The accident occurred about noon, and shortly thereafter Dark took the injured boy to Dr. Brown's office. Dr. Brown thought the arm should be X-rayed before any treatment was administered, and suggested availability of a Walnut Ridge physician. Dark told Dr. Brown he knew Dr. McAdams, of Jonesboro; that Dr. McAdams had operated upon him for appendicitis and had also treated his wife, and that he regarded him as a competent physician.

Appellee testified that he took the boy to Dr. McAdams' hospital March 4: "Dr. McAdams made two X-ray pictures before setting the arm, put the boy to sleep, set the arm, then made two more pictures. Dr. Brown held the boy's arm while Dr. McAdams applied the cast on the arm. It was a plaster of paris cast which gets hard after it sets, extending from an inch or two above the elbow down to below the thumb. The arm was curved—not straight—when the cast was applied, and the elbow was bent before the cast hardened. The cast wrinkled in the elbow like my coat sleeve. It was put on next to the flesh and did not allow for swelling. McAdams told me if it needed anything else Brown could take care of it. In applying the cast they took strips and laid them along the arm on top and bottom, then wound other strips around the arm. The next day the arm began to swell and I took him to Brown and asked him if it didn't need loosening, and he said 'No.' . . . I took him back to Brown Friday or Saturday. . . .

He saw the boy several times and gave him hypodermics two nights—Saturday and Sunday. On Sunday he loosened the bandage, but the arm was swelling so much it wouldn't do much good. . . . Dr. Brown said it wouldn't do any good to put on a cast if you were going to take it off or loosen it. He loosened it a little, but it filled up again.

''Monday morning I took the boy to Jonesboro, and when the cast was taken off the arm was blistered. Inside the elbow it was black. Dr. McAdams insisted that I leave him, but I couldn't. I came home and took him back on Tuesday. He treated him both Monday and Tuesday, and on Wednesday I put him in the hospital and kept him there Thursday and Friday. The top half of the cast had been taken off and the arm left in the lower part. He put vaseline on the blisters and left gauze on top of the arm. On the days he was in the hospital Dr. McAdams would come in of a morning whistling, take the gauze off, look at it [the arm], and then go on off. I saw he was doing nothing for him, so I took him home. I took him back to Dr. Brown who suggested I boil water, put salts in it, and pour over the arm. He brought me some healing powder and we used that. He brought a salesman who wanted to sell me larvae to eat out the sloughing flesh. I saw they were doing nothing, and I took the boy to Dr. Cooper at Thayer, Missouri, on March 22. There was a place an inch long and an inch and a half wide that just rotted out. The bone became infected. . . . From there I took him to Dr. Campbell, a bone specialist, at Memphis. They operated and put in tube for drainage. I took him back about June 17 and was told it was draining all right, and to bring him back in about a month. In July they decided to take out part of the bone, which was done in August. I took him back November 30 and they reported there was nothing else they could do for him. . . . The fingers are stiff and the arm useless.''

On cross-examination appellee testified that on March 4th Dr. McAdams did not say anything about leaving the patient in the hospital, . . . ''but did

try to get me to leave him the following Monday when I was there. . . . I didn't intend at that time to take him back to McAdams. No one said anything about loosening the splints at that time. I considered McAdams' connection with the case terminated at that time. . . . The fourth of March was Thursday. . . . I saw Dr. Atkinson Friday or Saturday. . . . He told me I should take him to Dr. McAdams the next morning, and I did. Brown did not advise me to take the boy back to Dr. McAdams before the 8th. The arm began to swell on Friday, the 5th—the day following my trip to Jonesboro. The bandage was first loosened a little on Sunday, but it wasn't loosened enough to relieve the boy until Dr. McAdams took it off on Monday. Dr. McAdams cut the tops off the blisters, removed the splint, took the top piece away, whittled out the wrinkles in the lower piece, and put his arm back in it. He urged me to leave the boy in the hospital, but I wouldn't do it because I had not made arrangements to leave him. I did not realize that he needed surgical attention. I agreed on the 8th to bring the boy back on the 9th and leave him in the hospital. I stayed in the hotel at Jonesboro on the night of March 9th—did not come back to Hardy—and put the boy back in the hospital Wednesday morning, March 10. . . . I took the boy home on the 12th because nothing was being done for him there."

"Q. When you told Dr. McAdams that you couldn't remain away from your business any longer, did he tell you that if the boy was going to be fretful there, that he would take him to his home and keep him there? A. He probably said that. He was very nice in that way—he probably said that."

The witness then testified that after returning from Jonesboro with his son on the 12th . . . "we bathed [the arm] several times a day, according to Dr. Brown's instructions—for the ten days before we took him to Dr. Cooper."

"Q. Did his condition become worse from the 12th to the 22nd? A. When the cast first came off [the arm] was ruined, and it never got any better until July. Q.

Then during that time you treated it yourself? A. Well, not altogether. My treatment was under Dr. Brown's instructions. Q. And with this boy's arm decaying, you were continuing your own treatment, as you say, according to Dr. Brown's directions, from the 12th until the 22nd of March? A. Yes, sir.''

Dr. C. J. Govar, a physician of Hardy, testified that, in his opinion, the boy's arm is totally and permanently injured. ''In my opinion, the condition of the arm was caused by undue pressure either from being bandaged too tightly, or the cast binding the arm. . . . The sloughing that occurred after March 12th was the result of circulation being cut off. How long a time would be required before decomposition after circulation is cut off would depend upon the amount of the pressure. Slight pressure would take longer. Where there is complete strangulation of the tissue, damage might occur in twelve hours. I have a hospital at Hardy, and the child was brought to me April 15. I was advised that he was under treatment of Dr. Cooper. The father told me that because of the distance to Thayer he had Dr. Cooper's permission to bring him to me to dress the arm. . . . If a green stick fracture in a child is brought to me, it is customary to complete the fracture and then reduce it and put the arm in splints or cast, whichever is your preference. It is optional with the doctor. Some prefer one kind, some another.

''The pictures [X-rays] which you have shown me indicate a complete fracture of the radius and a green stick fracture of the ulna. The other picture shows apposition of the bones very nearly perfect. . . . Swelling occurs after splints are applied in practically every case of a fracture. It is necessary to either pad it before application, or loosen it to correct whatever is causing the pressure. . . . The swelling occurs thirty minutes after the accident, or may not be troublesome until the next day. Trauma or considerable violence inflicted at the time the fracture occurs may cause swelling more quickly or to a greater degree, therefore the necessity for having the patient where you can observe

it. . . . A cast should be cut on both sides to allow for expansion. If plaster of paris splints are put on in two parts, it would be necessary to anchor them with gauze bandage or a plaster bandage. . . . In practically every case there is swelling enough to require loosening of the bandage. I would want the patient under my observation during the period the swelling might occur. . . . Discoloration on the arm [showing] between the 4th and 12th could have been the result of violence inflicted at the time of injury.''

Dr. Cooper testified: ''At the time I saw [the patient] March 22, the arm was swollen twice the normal size. He had a high temperature. There was a place about one and a half inches wides and two inches long where the tissue was sloughing out. There was no circulation. I made two incisions in his hand for drainage. In my opinion there had been interference with circulation. Bandaging too tightly or applying the cast too tightly could stop circulation. . . . After splinting, and the arm swells, the bandage should be released. . . . When I reduce a fracture I want the patient under my observation until the splints are removed, principally because of the possibility of swelling. . . . A swollen arm on March 22nd would not necessarily indicate that a bandage or splint applied on the 12th was put on too tightly. Swelling is likely to have occurred the next day, or it might have been sufficient in two or three days to cause harm. . . . [The arm] could have been bandaged properly on the 12th and still have been in the condition I saw it on the 22nd. It would take two or three days for the sloughing or decaying that I saw to get that bad. . . . The arm could have been treated and bandaged properly on the fourth of March and still have been in the condition I saw it, depending on the treatment it had received between those dates. I sent him to Dr. Speed at Memphis because he is a bone specialist and well known to me.''

Dr. McAdams testified: ''After examining the X-ray film in Mr. Dark's presence, I told him that it was a bad fracture, and that he had better leave the boy in the hos-

pital. He told me he couldn't do that and asked if I could fix him up and let him take him home. I said 'Yes, I can, but we will have to give him an anaesthetic, and it will be a few hours before you can take him away. I'll put on a molded plaster of paris splint with the understanding that you return upon the least indication of too much swelling.' He promised to bring him back as directed. . . . Dr. Willett gave the boy an anaesthetic, the fracture was reduced, and the molded splints applied, one on top and one on the bottom, then wrapped with gauze bandage.

"A second X-ray picture was taken after the splints were applied. After the bones were placed in apposition, we brought the arm to about a right angle to the elbow. A piece of sterile gauze was laid on top of the arm after it had been cleaned with alcohol. Another piece of gauze was put underneath from the hand to the elbow and another piece from the elbow up the arm on either side. While holding these in place the arm was wrapped lightly with gauze bandage which gives to pressure considerably. Splints were applied to the top and bottom of the arm, being moulded to fit the contour at all points. When that was done we put a sling around the arm to hold the arm and splint. This is the usual and customary method of treating this type of fracture. The purpose of the splint is to hold the bones in apposition, and it has no value unless it does do so. It must be applied snug, or reasonably so.

"There is more or less injury to the tissue from any fracture, due to the violence of the force that causes it. In nearly every fracture there is more or less swelling. There was padding under this splint, although padding is not necessary at all times—in some cases they apply it directly to the skin. . . . I agreed to put splints on the arm and let Mr. Dark take the boy home upon the promise to return him in case there was any swelling or pain in the arm or blueness in the fingers, and he said he could bring him back any day. After the cast was applied, I suggested to Mr. Dark that in case of swelling the bandage could be loosened with scissors, and

said: 'You can have Dr. Brown do that until you can get him back to my office.'

"I next saw this patient four days after the splints were applied. When the boy was brought back on the 8th, Dr. Willett cut the bandage, called me at my home, and told me that they were there. I went to the office, removed the dressing, and there were quite a few blisters on the top of the arm and on the hand. They were clipped to let them drain, then sterilized. White carbolated vaseline was placed on gauze and laid on top of the arm and underneath the arm, and the arm put back in the bottom splint with the bandage going around the arm to hold it securely. . . . On the 8th the pulse was good; there was no blueness of the fingers, and the boy could move his hand.

"I suggested to Mr. Dark that the boy should be placed in bed with the wrist and arm elevated, and asked him to take him to the hospital. He said he couldn't do that, but if I would treat it he would return on the 9th. He returned on the 9th, but indicated that his business at home was such that he could not leave him that day, but promised to bring him back on the 10th and leave him in the hospital as long as necessary. I told him it was not a good idea to be hauling a child around with a broken arm. . . . The boy entered the hospital Wednesday, March 10. I removed the splint, took off the dressing, reapplied vaseline, wrapped it in gauze and elevated the arm on a pillow. The boy had a temperature of 103. He remained in the hospital until three o'clock of the afternoon of the 12th—approximately 48 hours. During that time I saw the patient twice a day and dressed the arm. Temperature went down to practically normal, swelling was much better, the blisters looked better, he had a good pulse, and movement in his wrist and fingers. He was apparently free of pain at the time he left the hospital.

"When informed on the 12th that Mr. Dark was going to take the boy home, I asked that he [Mr. Dark] be sent to my office. He came to the office and I tried to get him to leave the boy, but when he refused, I went to the hospital, dressed the arm, and fixed it so he could

take him home. I offered to keep the boy at my home if he would leave him, but he would not do that. Mr. Dark said he could get the boy attended to nearer home, and mentioned Dr. Cooper at Thayer. Nothing was said about Dr. Brown. I gave Brown no instructions for treatment. The arm was discolored on the 8th when the splint was removed. . . . I think that if he had been left at the hospital at the time he was taken away on the 12th he would have had a good arm. . . . I understood my services were terminated on the 12th. . . . From the testimony I am of the opinion that some infection got into the neighborhood of the fracture, that pus formed and produced a lot of internal pressure, as distinguished from pressure from bandages.''

Testimony of Dr. Willett and the appellant Dr. Brown was substantially the same as that of Dr. McAdams.

The plaintiff requested this instruction, which was given: ''If you find from the evidence that the defendants failed to use reasonable care and diligence as alleged in plaintiff's complaint in setting, binding, and treating the arm of Dewey Dark, Junior, on March 4, 1937, and that such failure . . . resulted in injuries to the said Dewey Dark, Junior, it will be your duty to find for the plaintiffs . . .''

In another instruction the court said: ''. . . [You may] take into consideration the loss of earning power . . . which you find to result from the negligence, if any, of the defendants on March 4, 1937 . . .''

The complaint alleges: (1) That the defendants, in attempting to set the broken bones, were negligent; (2) that defendants placed the arm in a cast without protecting the flesh; (3) that the arm was bound too tightly, resulting in stoppage of circulation; (4) that the cast was so constructed as to cut into the flesh; (5) that because of a lack of skill in treating the arm, it became inflamed and diseased, and (6) that the defendants refused to properly treat and dress the arm.

Counts 1 to 5, inclusive, relate to the manner of reducing the fractures and setting the bones—the latter expression having reference to the dressing and cast.

Finally, it is alleged that the defendants refused to properly treat and dress the arm. All of the matters included in counts 1 to 5 relate to allegations of misconduct or lack of skill with respect to services rendered March 4th. The sixth count involves a later period.

There is no proof of refusal by either appellant to treat the patient. On the contrary, appellee says Dr. Brown continued his services. On Saturday and Sunday nights hypodermics were administered by Dr. Brown, and he also loosened the bandages. A liberal construction of the allegation might be that in failing, prior to Saturday, to remove or loosen the cast, there was declination to give treatment, but it can hardly be said, in the light of appellee's own testimony, that Dr. Brown was not exercising his best professional judgment, even though he may, and perhaps was, in error in not undertaking to give other relief. Certainly Dr. McAdams is not to be charged with a failure to render services when appellee regarded the one treatment or operation at Jonesboro as the final services McAdams was to render, and so testified. Nor can it be said that Brown was McAdams' agent, or that McAdams was continuing his professional services through Dr. Brown. Substance of the complaint is that there was a want of skill on the part of McAdams and Brown, who acted jointly in applying the treatment—that the cast was applied too tightly, and when it was bent to accommodate the arm in a sling, wrinkles formed in the interior of the cast, and when it set or hardened, these wrinkles bruised the flesh when swelling occurred—a condition brought about through failure of the physicians to place yielding or resilient material between the flesh and the cast.

The evidence is sufficient to show that wrinkles did form in the cast at or near the elbow, but it is not sufficient to show that the infection complained of was caused thereby. The result may be susceptible of such an inference, but verdicts cannot be predicated upon inferences and speculation.

Was the cast applied too tightly, and was it improper to place it in contact with the skin?

Dr. McAdams testified that the arm was wrapped lightly with gauze bandage "which gave to pressure considerably," but this is denied by appellee, who says he was present and saw the operation. In view of the jury's verdict, we must assume that appellee's version of the transaction is the correct one and find an answer to the controversy in a theory based upon direct application of the cast to the arm, with no intervening protection.

Dr. Cooper, to whom appellee turned for expert assistance, says that he directed appellee to Dr. Speed. . . . "because he is a bone specialist and well known to me." Appellee says that he took the patient from Dr. Cooper's office to "Dr. Campbell, a bone specialist, at Memphis." Dr. Cooper correctly classifies Dr. Speed as an expert—a man of eminence in the profession.

Dr. Speed testified: "I am a graduate of Johns Hopkins Medical School, interned four years in Baltimore, had two years in the army, have practiced orthopedic surgery since 1920, and am a partner with Dr. Campbell in Campbell's Clinic at Memphis, Tennessee. I am a Fellow of the American College of Surgeons. I was present in the court room when Dr. McAdams testified and heard his testimony. His testimony indicated proper treatment for the type of injury involved. Gauze or padding between the splint and arm is not always used. In applying casts in the last eight or ten years, we have been using skin-tight casts—a cast which is applied directly to the skin. This is well recognized in Europe and in this country, and we use it ourselves."

"Q. What would you say, doctor, if there had been no gauze between the splint and the arm—would you say this is proper? A. I would say that it would, and has been customary for me to use it in many cases."

Continuing his testimony, Dr. Speed said: "In all fractures of the forearm the cast should extend above the elbow. . . . I treated this patient first May 16, 1937. We made an X-ray picture which showed a fracture of

both bones of the forearm, dislocation of one bone, osteomyelitis of this bone and to a certain extent to other bones. . . . The picture showed excellent apposition of the bones at the points of fracture, but did disclose . . . infection. . . . Volkmann's paralysis is a degenerative change which takes place in the muscles and nerves and soft tissues of the arm and results in damage to circulation as a general rule. This paralysis can result from a number of different causes. It may be the result of a direct injury to the blood vessels of the arm when the blood supply is cut off to the muscles; this degenerative change occurs following that. It may be due to hemorrhage or swelling within the fasciae covering of the arm. Muscles and deep structure are cased in a fasciae formation which binds them together. . . . It may be due to stricture due to splinting or pressure.

"From the condition of the patient disclosed by the testimony, and from the condition which I saw on May 16, I would not be able to tell the original cause of the trouble. Assuming the important conditions which have been mentioned in regard to the circulatory condition—presence of radial pulse, which indicates blood is being supplied to the parts, and movement of the fingers—I would say that at the time the boy left the hospital there had been no serious or permanent interference, and with proper care from then on, the condition should have improved, and the patient would have recovered. . . . The condition [that caused permanent impairment of the arm] could have developed after March 12th. . . . From the testimony of Dr. McAdams, it is my opinion that this case was handled well by him throughout the treatment of the fracture, both regarding the X-raying of it, the reduction of the fracture, the apposition of the bones, the type of immobilization which was used, and the instructions which were given with regard to the kind of precautions necessary. . . . I see no serious objection if the arm is almost straight to bringing it to right angle position after the splint is applied. There will be some wrinkling in the splint if you change your position. . . ."

Drs. W. P. Lutterloh, W. O. Tibbles, R. M. Sloan, W. M. Johnson, and R. M. Johnson testified that the methods Dr. McAdams says he used were proper.

The material conflict between the testimony of appellee, and that of Dr. McAdams with respect to application of the cast is: Was the cast placed next to the skin, or was gauze used between?

Appellee's witness, Dr. Govar, testified that it was optional with the doctor whether splints or a cast be used to accomplish immobilization—"some physicians use wood, some wire, and some plaster of paris. . . . I wouldn't deem it advisable to place plaster of paris cast against the skin. I believe it better to put some kind of padding over the skin because if a person is hairy the hair will join the cast, and if the skin is tender you may get a burn."

No physician testified for appellee that direct application of the cast to the skin would be improper from a professional standpoint. Dr. Govar's aversion to plaster of paris was based on the possibility that hairs on the arm might become attached to the cast, "and if the skin is tender you may get a burn." There is no testimony in the record that the blisters caused infection, or that the deep-seated malady was produced by plaster of paris burns; and Dr. Speed testified that direct application was generally approved.

Although Dr. McAdams testified that on the 8th of March the patient had radial pulse in the arm and hand, and could move his fingers, such testimony cannot be accepted as undisputed, the witness being a party to the suit. However, Dr. Willett said: ". . . I cut the bandage between the splints [on March 8th about one o'clock]. I examined his pulse and he had radial pulse, which means circulation of the blood."

There is no testimony in the record to show that the cast was too tight when first applied. There is testimony that within a short time swelling occurred, and that proper treatment probably would have been to loosen the tension. Dr. McAdams cannot be charged with such failure, for he had no opportunity to act. Appellee says he

regarded Dr. McAdams' services as having ended March 4th. His entire case, as reflected by his instructions, is predicated upon appellants' negligence and want of skill when the operation was performed.

Our conclusion is that appellee has failed to support his allegations with substantial evidence. This is a case where a layman took chances and experienced misfortune of a tragic nature. If the doctrine *res ipsa loquitur* applied, the judgments might be sustained. But it does not. Medicine and surgery are inexact sciences, and physicians are not guarantors of results. Our view is that permanent injuries to appellee's son were occasioned by appellee's own negligence or error of judgment in not leaving the patient with Dr. McAdams when it became apparent infection had developed.

The judgments are reversed, and the causes dismissed.