Kathy June TAYLOR *v.* C. Michael RIDDELL, M.D.

94-880                                     896 S.W.2d 891

Supreme Court of Arkansas
Opinion delivered May 8, 1995

*Karr, Hutchinson & Stubblefield*, by: *Charles Karr*, for appellant.

*Friday, Eldredge & Clark*, by: *Calvin J. Hall* and *Tonia P. Jones*, for appellee.

JACK HOLT, JR., Chief Justice. This is a medical malpractice case in which the appellant, Kathy June Taylor, contended that the appellee, Dr. C. Michael Riddell, was negligent in causing and failing to diagnose a vesicovaginal fistula that developed following her abdominal hysterectomy. Ms. Taylor raises three points for reversal of a jury verdict in favor of Dr. Riddell, asserting that the trial court erred in (1) refusing to give her requested instruction on *res ipsa loquitur*; (2) giving the second paragraph of AMI Civil 3d 1501 (duty of physician, etc.) relating to expert witnesses because that paragraph is a comment on the evidence in violation of the Arkansas Constitution; (3) giving AMI Civil 3d 603 (no presumption of fault from happening of injury) because it is a comment on the evidence in violation of the Arkansas Constitution. None of these arguments has merit, and we affirm the judgment of the trial court.

*Facts*

Dr. Riddell is a board-certified obstetrician and gynecologist at the Millard-Henry Clinic in Russellville. Ms. Taylor, though not a regular patient of his, went to Dr. Riddell when she was having problems with her menstrual periods. After two office visits and an examination, Dr. Riddell scheduled Ms. Taylor for surgery. On August 30, 1991, he performed an abdominal hysterectomy on her at St. Mary's Hospital in Russellville.

Ms. Taylor was discharged from the hospital by Dr. Riddell on September 4, 1991. She returned to the Millard-Henry Clinic on September 6, 1991, to have her staples removed. She did not see Dr. Riddell at that time or subsequently. Ms. Taylor stated that she experienced nausea and pain during this period. On September 13, 1991, she returned to the clinic for some lab work but did not see a physician. Her efforts to contact Dr. Riddell at various times were unavailing. According to Ms. Taylor, the pain persisted, and, on September 15, 1991, she went to the St. Mary's Hospital emergency room, where she was seen by another physician, who diagnosed her as suffering from a urinary tract infection and noted that she was incontinent. This was the first occasion of record on which Ms. Taylor reported her problem.

It is Ms. Taylor's assertion that urine flowed continuously through her vagina while she was recovering in the hospital and after she had returned to her home. On October 9, 1991, she saw Dr. Paul Kradel, a Fort Smith obstetrician and gynecologist, at the Johnson County Regional Hospital in Clarksville. Dr. Kradel discovered that Ms. Taylor had a vesicovaginal fistula, *i.e.*, a small opening in the walls of the bladder and the vagina through which urine leaks from the bladder into the vagina and is discharged in an uncontrolled manner.

Dr. Kradel referred Ms. Taylor back to the Millard-Henry Clinic, and, while she refused to see Dr. Riddell, she agreed to make an appointment with his partner, Dr. Jody C. Calloway. On October 14, 1991, Ms. Taylor saw Dr. Calloway, who confirmed the diagnosis of vesicovaginal fistula and referred her to Dr. David Barclay, a Little Rock gynecologist. Ms. Taylor saw Dr. Barclay on October 24, 1991. Dr. Barclay also confirmed the diagnosis of vesicovaginal fistula and scheduled Ms. Taylor for surgery to repair the condition. On November 6, 1991, Ms. Taylor was successfully operated upon. Since that time, she has had no further urinary problems.

Ms. Taylor filed a complaint in the Johnson County Circuit Court on April 16, 1992, alleging, among other things, that Dr. Riddell negligently punctured her bladder during surgery and failed to discover the puncture or to repair it before the incision was closed. She further pleaded that "Subsequent examinations revealed a vasico-vaginal fistula just above the vaginal cuff anteriorly." Ms. Taylor also asserted that "[t]he doctrine of *res ipsa loquitur* applies."

A three-day trial was conducted in January 1994. The jury returned a unanimous verdict in favor of Dr. Riddell, and the circuit court dismissed the complaint with prejudice. From that judgment, this appeal arises.

## I. Res ipsa loquitur

In her first argument for reversal, Ms. Taylor contends that the trial court erred in refusing to give her requested instruction on the applicability of the doctrine of *res ipsa loquitur*.[1] At the

---

[1] The doctrine of *res ipsa loquitur* (Latin for "the thing speaks for itself") had its

conclusion of the testimony, Ms. Taylor tendered Plaintiff's Requested Instruction No. 1, based on AMI Civil 3d 610:

> With respect to the question of whether Defendant was negligent, Plaintiff has the burden of proving each of the following two propositions:

> First: That the injury was attributable to the surgery while the operative site or field was under the exclusive control of defendant.

> Second: That in the normal course of events, no injury would have occurred if Defendant had used ordinary care while the operative site or field was under his exclusive control.

> If you find that each of these two propositions has been proved by Plaintiff, then you are permitted, but not required, to infer that Defendant was negligent.

The trial court ruled that the proffered instruction was "not proper in this case pursuant to the Supreme Court's holding in *Schmidt v. Gibbs.*"

In *Schmidt v. Gibbs*, 305 Ark. 383, 807 S.W.2d 928 (1991), a wrongful-death medical malpractice case, we set forth those circumstances in which the doctrine of *res ipsa loquitur* may be invoked:

> 1. The defendant owes a duty to the plaintiff to use due care;

> 2. The accident is caused by the thing or instrumentality under the control of the defendant;

---

origins in a 19th-century English case, *Byrne* v. *Boadle*, 159 Eng. Rep. 299 (1863), in which a barrel of flour rolled out of a warehouse window and fell upon a pedestrian beneath. The classic statement of the doctrine was formulated in *Scott* v. *London & St. Katherine Docks Co.*, 159 Eng. Rep. 665 (1865): "There must be reasonable evidence of negligence; but where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care." *See* Keeton, *Prosser and Keeton on the Law of Torts* 243-244 (5th ed. 1984).

3. The accident which caused the injury is one that, in the ordinary course of things[,] would not occur if those having control and management of the instrumentality used proper care;

4. There is an absence of evidence to the contrary. [Citations omitted.]

If each of the elements for the application of the doctrine of *res ipsa loquitur* is present, then "the accident from which the injury results is prima facie evidence of negligence and shifts to the defendant the burden of proving that it was not caused through any lack of care on its part." [Citation omitted.]

305 Ark. at 387, 807 S.W.2d at 931.

■ We went on, in *Schmidt*, to survey the "confusing and unclear" history of the application of the doctrine of *res ipsa loquitur* in Arkansas,[2] noting that from *Routen* v. *McGee*, 208 Ark. 501, 186 S.W.2d 779 (1945), onward, cases and treatise writers had concluded that Arkansas did not recognize the doctrine's applicability to the practice of medicine and surgery. Clarifying the case of *Brown* v. *Dark*, 196 Ark. 724, 119 S.W.2d 529 (1938), which had been misconstrued in *Routen*, we expressly held that "the doctrine of *res ipsa loquitur* may apply in cases of medical malpractice on the part of any and all medical care providers as defined by the Medical Malpractice Act if the essential elements for application of the doctrine exist." 305 Ark. at 389, 807 S.W.2d at 932.

The *Schmidt* opinion is directly on point and requires a close reading. There, the appellant, acting as administrator of his wife's estate, sought to hold the appellees (a surgeon, an anesthesiologist, attending nurses, a hospital, and its carrier) liable under *res ipsa loquitur* for the death of his wife nearly two weeks after an

---

[2]Arkansas has not been singular in that regard. Professor Prosser noted that "the use of the phrase itself has become a definite obstacle to any clear thought, and it might better be discarded entirely." Prosser, *Handbook of the Law of Torts* 213 (4th ed. 1971). It has also been noted that "there is nothing distinctive about the doctrine" and that "[i]n a formal sense, . . . the logic used in res ipsa loquitur cases is the same as that in all cases of circumstantial evidence." Harper, James, & Gray, 4 *The Law of Torts* 27 (2d ed. 1986).

operation in which a six-inch flame shot from her throat as she was undergoing a tracheostomy procedure. This court held that the appellant was not entitled to the application of the doctrine of *res ipsa loquitur* against the anesthesiologist and his nurse because, with respect to the fourth requirement, there was "evidence to the contrary" that indicated the use of "proper care":

> The expert witness selected by the appellant has testified in clear and unequivocal terms that the care and treatment offered by Dr. Browning and Nurse Ray was not below the standard of care required. In addition, the appellees' expert witness, Dr. Robert G. Valentine, corroborates Dr. Jeffries' opinion that Dr. Browning and Nurse Ray had met the requisite standard of care.
>
> Appellant attempts to maintain the potential liability of Dr. Browning and Nurse Ray by submitting Dr. Jeffries' affidavits opining that the type of fire which occurred in this case could not happen absent negligence on behalf of someone on the surgical team. . . . However, this evidence is insufficient to overcome Dr. Jeffries' testimony that the actions of Dr. Browning and Nurse Ray were not below the standard of care required. This testimony constitutes "evidence to the contrary" thereby preventing the application of the doctrine of *res ipsa loquitur.*

*Id.*

On the other hand, we held that, with respect to the hospital's insurance carrier, the second element of *res ipsa loquitur* had been established because "[t]he operating room, equipment, and nurses were all things or instrumentalities under the control or management of Baptist Medical Center." 305 Ark. at 390, 807 S.W.2d at 932. Further, we declared that expert testimony had set forth facts that, "if believed, would satisfy each of the remaining elements necessary for the application of the doctrine of *res ipsa loquitur.*" *Id.*

The difference in the respective situations of the anesthesiologist and nurse and the insurance carrier was explained thus:

> [T]here was clear and unequivocal testimony that Dr. Browning and Nurse Ray had met the standard of care. The testimony concerning the care provided by nurses who

were employees of Baptist Medical Center is not so clear and unequivocal.

The evidence before the trial court concerning the care provided by the nurses and Baptist Medical Center consisted of the deposition and two affidavits of plaintiff's expert witness, Dr. Mervyn Jeffries. In his deposition, Dr. Jeffries stated that he was not "in any way critical of the nurses in the care they provided during the tracheostomy procedure." This testimony is not an unequivocal statement that the nurses met the requisite standard of care. In Dr. Jeffries' affidavits he opines that the type of fire that occurred in this case could not happen absent negligence on the part of someone on the surgical team comprised of Dr. Gibbs, Dr. Browning, Nurse Ray, and the nursing team. If believed, these facts, in our view, would warrant the application of the doctrine of *res ipsa loquitur.*

305 Ark. at 390, 807 S.W.2d at 932-933.

In the present case, only the first necessary element of *res ipsa loquitur* was present. A physician-patient relationship existed between Dr. Riddell and Ms. Taylor, and it is undisputed that the former owed a duty to the latter to use due care.

According to Ms. Taylor, the operative site and the surgical instruments were under the exclusive control of Dr. Riddell and his assistant, Linda Bolte, a certified operating-room technician. Yet testimony differed on whether the "accident" (as the *Schmidt* phrasing has it) was caused by the "thing or instrumentality" under the control of Dr. Riddell and his assistant.

The "accident" at issue was the formation of the vesicovaginal fistula. Ms. Taylor presented the videotaped testimony of Dr. Bernard Nathanson of New York, who surmised that a misplaced suture caused the opening. No proof was adduced to support this view. Indeed, Dr. Nathanson's speculation was explicitly refuted by Dr. Calloway, who stated that there was no evidence of a misplaced suture and that blood would have been present in the urine had the bladder been punctured during surgery. Dr. Calloway also noted that, prior to the hysterectomy, Ms. Taylor had undergone three Caesarean sections and "already had a lot of scar tissue present." Consequently, there was a decreased blood

flow to the area around the bladder and vaginal cuff. Dr. Calloway suggested the likelihood that when Dr. Riddell operated on Ms. Taylor, "he probably further compromised that tissue," thereby decreasing the blood flow and leading to the necrosis, or death, of the tissue and its sloughing off.

Dr. Barclay, who repaired the fistula, also testified that, based on "the sequence of events," it was his opinion that "there was a thinned area of the bladder. It underwent necrosis over a period of seven to ten days after which [Ms. Taylor] began noticing leakage." Moreover, he disagreed with Dr. Nathanson's assessment that the presence of a fistula of itself indicates negligence on the part of the physician, pointing out that "any surgeon who has done a lot of pelvic surgery, *particularly on women who have had sections* or have other complications of the pelvis, eventually there is going to be a vesicovaginal fistula; and that's just the way it is no matter how good he might be."

In his own testimony, Dr. Riddell described the Caesarean-section scar tissue connecting Ms. Taylor's bladder and vaginal cuff as having been "glued down like cement." He explained that, if he had entered the bladder during surgery, he would have seen urine spilling out immediately, and blood would have been detected in the urine. Ms. Taylor's urine, however, "was clear through the case." Dr. Riddell stated that the fistula occurred because Ms. Taylor "had a decreased blood supply to a small area of the bladder that allowed it to basically dissolve away, and it took time for this to occur, and subsequently the urine found a way to escape from the bladder and go through — erode into the vagina."

Dr. John David McClanahan, a obstetrician and gynecologist from Fort Smith, testifed as an independent witness for Dr. Riddell that the normal course of fistula formation following surgery is two weeks or later. Given the description of clear urine in the post-operative nurses' notes, Dr. McClanahan concluded that "there would have been no puncture to the bladder as this would have manifested itself in some blood noticed in the urine, and there was no evidence of any significant urinary leakage post-operatively according to the hospital records." He suggested that the fistula formed after Ms. Taylor visited the hospital emergency room on September 15, 1991. Dr. McClanahan opined that

the fistula resulted from "a development of tissue necrosis and sloughing with the bladder tissue eroding through the vaginal wall." He characterized the presence of the fistula as a "maloccurrence" rather than as a result of negligence because the physician "was working with tissue that had already been operated on three times previously, and there had been considerable dissection and difficult dissection required in the operation just prior to the operation he performed." Contradicting Dr. Nathanson, Dr. McClanahan found no objective evidence of a misplaced suture.

The record reveals an imposing volume of testimony pointing to a cause of Ms. Taylor's vesicovaginal fistula other than a "thing or instrumentality" under the control of Dr. Riddell. The trial court was thus able to determine, as a matter of law, that the second prong of the *Schmidt* test had not been met.

Regarding the third element of the *Schmidt* requirements, Ms. Taylor failed to establish that the "accident" that caused the injury was one that, in the ordinary course of things, would not have occurred if those having control and management of the instrumentality had used proper care. As in *Schmidt* v. *Gibbs, supra*, there was clear and unequivocal testimony that Dr. Riddell had met the requisite standard of care.

It was Ms. Taylor's expert witness, Dr. Nathanson, who in essence established the context for considering the standard of proper care. In his videotaped deposition, he explained that Dr. Riddell, although practicing in Russellville, Arkansas, was subject to the same standard of care that applies to all board-certified obstetricians and gynecologists nationwide: "the local standard is a national standard. . . . [T]he physicians here are all Board certified; Dr. Riddell, Dr. Calloway, Dr. Barclay, and so on. . . . There is no such thing as a local standard, when one speaks of being Board certified."

In light of that "national standard," the testimony of the witnesses indicates that the complication of a vesicovaginal fistula is, as Dr. Barclay put it, "a recognized risk of hysterectomy in the best hands." Even Dr. Nathanson acknowledged that Ms. Taylor was at increased risk for such a complication due to scarring from her three Caesarean sections. Dr. Barclay stated that Dr. Riddell did not deviate from the standard of care in performing the surgery. Dr. McClanahan emphasized that the presence of a

genital urinary fistula is "not necessarily a result of negligence" and that Dr. Riddell "exercised the standard of care appropriate to this area." Hence, the third element of the *Schmidt* test was not present.

Finally, the fourth part of the *res ipsa loquitur* requirements, an "absence of evidence to the contrary," was not satisfied. The foregoing summary of testimony from Drs. Calloway, Barclay, Riddell, and McClanahan illustrates the abundance of credible evidence placed before the trial court to counter the assertions of Ms. Taylor and Dr. Nathanson. Further, apart from Ms. Taylor's diary entries (the earliest of which she acknowledged had been written "after a few days") that noted a problem with leakage during the period of her hospitalization, the nurses' records of bed-linen changes and other evidence indicated nothing of the kind.

 It cannot be said that the trial court erred as a matter of law in denying the requested *res ipsa loquitur* instruction.

## II. AMI 1501

For her second point for reversal, Ms. Taylor argues that the trial court's inclusion of the second paragraph of AMI Civil 3d 1501 in Instruction No. 8 amounted to a comment on the evidence in violation of the Arkansas Constitution. The disputed language reads as follows:

> Now, in deciding whether Doctor Michael Riddell applied the degree of skill and learning which the law required of him, you may consider only the evidence presented by the surgeons called as expert witnesses.

Ms. Taylor contends that this portion of the instruction unconstitutionally comments on the evidence by calling particular attention to the testimony of the physicians appearing as expert witnesses. However, the authorities on which she relies — all of them criminal cases[3] — are inapposite to the circumstances of the present case.

 The second paragraph of AMI 1501 should be used only when the plaintiff asserts that the doctor failed to apply the

---

[3]*Walker* v. *State*, 239 Ark. 172, 388 S.W.2d 13 (1965); *Bing* v. *State*, 52 Ark. 263, 12 S.W. 559 (1889); *Keith* v. *State*, 49 Ark. 439, 5 S.W. 880 (1887).

requisite degree of skill and learning. *See* "Note on Use," AMI Civil 3d 1501. Ms. Taylor's claim, grounded in her expert's supposition that the fistula was formed during surgery by a misplaced suture, is certainly an attack on Dr. Riddell's skill, necessitating the introduction of and reliance upon expert testimony. This court has held that, while expert testimony is not required when the asserted negligence lies within the comprehension of a lay jury, such as a surgeon's failure to sterilize instruments or to remove a sponge before closing an incision, when the applicable standard of care is not a matter of common knowledge, the jury must have the assistance of expert witnesses in coming to a conclusion on the issue of negligence. *Napier* v. *Northrum*, 264 Ark. 406, 572 S.W.2d 153 (1978); *Graham* v. *Sisco*, 248 Ark. 6, 449 S.W.2d 949 (1970). Here, the occurrence of a vesicovaginal fistula clearly lies outside the bounds of common knowledge.

An instruction that merely sets out the law applicable to the issue is not an improper comment on the evidence. *Dawson* v. *Pay Less Shoes #904 Co.*, 269 Ark. 23, 598 S.W.2d 83 (1980). The second paragraph of AMI 1501 does not provide for the testimony of any particular expert witness to be given greater weight; rather, it simply instructs the jury that, when a physician's skill or learning has been challenged, the applicable standard of care is to be determined exclusively through the assistance of expert testimony. When a model instruction is applicable in a case, it shall be used unless it does not accurately state the law. *Boyd* v. *Reddick*, 264 Ark. 671, 573 S.W.2d 634 (1978). The trial court did not err in giving the second paragraph of AMI 1501.

Ms. Taylor also contends that the trial court erred in refusing to give her requested Instruction No. 3, based on AMI Civil 3d 102, pertaining to the jury's personal observations and experiences. This instruction, however, may not be used when AMI 1501 is given, except in conjunction with an issue that does not require expert testimony. *See* "Note on Use," AMI Civil 3d 102; *Duke* v. *Lovell*, 262 Ark. 290, 556 S.W.2d 416 (1977). As the circumstances of the present case with reference to the standard of care imposed on board-certifiied obstetricians and gynecologists required the introduction of expert testimony from those with similar qualifications, the trial court correctly rejected the instruction based on AMI 102.

### III. AMI 603

Ms. Taylor's third and final point on appeal is that the trial court erred in giving Instruction No. 7, based on AMI Civil 3d 603:

> Now, the fact that an injury occurred is not, of itself, evidence of negligence on the part of anyone.

She asserts that the instruction violates the ban in Ark. Const. Art. 7, § 23, on the charging of juries with regard to matters of fact, reasoning that an injury is a fact, and, as such, it is impermissible for the trial court to comment upon it.

To support her position, Ms. Taylor cites a Georgia tort case, *Tolbert* v. *Duckworth*, 423 S.E.2d 229 (1992), in which the supreme court of that state held that the Georgia pattern jury charge on accident should be eliminated in civil cases. That instruction, however, defined the word "accident" and bears no resemblance to AMI 603. Moreover, the *Tolbert* case did not involve the issue of whether such an instruction was an unconstitutional comment on the evidence.

In any event, AMI 603 has been declared a correct statement of the law. *Pilkington* v. *Riley Paving Co.*, 271 Ark. 746, 610 S.W.2d 570 (1981). It was, therefore, not error for the trial court to give the instruction.

Affirmed.